UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JAMES and CAROL STEIN,

                Plaintiffs,

v.

CREEKSIDE SENIORS, L.P.,

                Defendant.

Case No. 3:14-cv-00432-CWD

**MEMORANDUM DECISION AND ORDER RE: DKTS. 40, 43, 45, and 48**

      Four motions are pending before the Court in this fair housing action filed by pro se Plaintiffs James and Carol Stein against the owner of their apartment complex, Creekside Seniors, L.P. First, are two competing motions for summary judgment on all claims asserted in the Steins' Amended Complaint. (Dkts. 43, 45.) Next, are two discovery motions filed by the Steins. (Dkts. 40, 48.)

      All parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 USC § 636(c). (Dkt. 27.) In the interest of avoiding delay, and because the Court conclusively finds the decisional process would not be significantly aided by oral argument, the pending motions will be decided on the record and without oral argument. Dist. Idaho L. Rule 7.1(d). For the reasons that follow, the Court will deny the Steins'

**MEMORANDUM DECISION AND ORDER - 1**

two discovery motions and their motion for summary judgment, and will grant Creekside's motion for summary judgment.

Before setting forth the background facts relevant to the summary judgment motions, the Court will take up the two discovery motions filed by the Steins.

## DISCOVERY MOTIONS (DKTS. 40, 48)

The two discovery motions filed by the Steins are: (1) a Motion to Compel Discovery Production (Dkt. 40); and (2) a motion requesting the Court to accept the unanswered requests for admission as admitted, and consider those admissions in the Court's consideration of the Steins' summary judgment motion. (Dkt. 48.) For the reasons that follow, the Court will deny both motions.

## 1. Background

On May 13, 2015, the Steins served five sets of interrogatories and six sets of requests for admission on Defendant Creekside. While the discovery was served upon Creekside, each discovery set was directed to individually named employees of Creekside.[1] On May 18, 2015, counsel for Creekside, Theresa Kitay, wrote to the Steins to inform them their discovery requests were untimely and legally deficient. The Court's Case Management Order (Dkt. 28) set May 22, 2015, as the deadline for the completion of factual discovery. Kitay referenced the language in the Court's Order providing that "discovery requests must be made far enough in advance of this deadline to allow for the

---

[1] The employees included both present and past employees. Specifically, the Steins served sets of interrogatories on: Maryann Prescott, Maria Cooper, Rusty Koller, Allen Zagelow, and Kevin Chaffin. The Steins served requests for admission on: Sherry Cox, Kevin Chaffin, Michelle Scher, Maryann Prescott, Todd Prescott, and Maria Cooper.

**MEMORANDUM DECISION AND ORDER - 2**

completion of the discovery by the deadline date." (Dkts. 28, 42-5.)  In addition to the untimeliness of their discovery requests, Kitay also informed the Steins that their discovery requests were legally deficient in two ways; specifically, that the discovery requests were improperly addressed to individuals who are not parties to the litigation, and also that several of the discovery requests called for conclusions of law, or asserted matters of fact without sufficient foundation, such that they were not susceptible to a response.

On May 20, 2015, the Steins filed an unopposed motion to extend the discovery deadline by forty days "to accommodate defendants[sic] responses of plaintiffs[sic] First set of Interrogatories and Requests for Admission issued by Plaintiffs…." (Dkt. 37.) The Court granted the motion, and the factual discovery deadline was extended through July 13, 2015. However, the Steins did not redraft or serve discovery requests on Creekside. On July 7, 2015, Kitay informed the Steins that their discovery requests served on May 13, 2015, though no longer untimely, still contained legal deficiencies, and for that reason, Creekside would not be responding to them. The Steins then filed a motion to compel responses to the May 15, 2015 discovery requests on July 10, 2015, three days before the new discovery deadline.[2]

The following month, each party filed their own summary judgment motion. (Dkts. 43, 45.) After these motions were filed, the Steins filed a motion requesting the

---

[2] In light of the Steins' pro se status and the fact that Creekside's counsel conferred by letter more than once in her attempt to allow the Steins to cure the discovery dispute, the Court finds the parties satisfied the meet and confer requirement before the Steins filed their discovery motion. *See* Dist. Idaho L. Rule 37.1.

**MEMORANDUM DECISION AND ORDER - 3**

Court to accept the unanswered requests for admission from the May 15, 2015 discovery requests, as admissions and for the Court to consider those admissions in its decision on the Steins' motion for summary judgment.[3]

## 2. Motion to Compel (Dkt. 40)

The Steins seek to compel answers to five sets of interrogatories and six sets of requests for admission which were directed to various Creekside employees not named as parties in this litigation. Defendants argue the discovery requests are legally deficient, because they were not directed to a party in this litigation as required by Fed. R. Civ. P. 33(a)(1) and 36(a)(1).The Court finds the discovery requests are legally deficient in both form and substance.

With regard to form, the Court finds the requests are improper as they are not directed to a party to this litigation. Fed. R. Civ. P. 33(a)(1); 36(a)(1). And, upon review of the requests for admission, the Court finds these requests are in an improper form, as the Steins ask in each "request" for the responding individual to "admit or deny," and/or are otherwise in a form that is not susceptible for admission, with or without an explanation of denial. *See* Fed. R. Civ. P. 36(a).

With regard to substance, the Court finds the discovery requests were unlikely to lead to relevant and admissible evidence in this fair housing action. Several of the Steins' discovery requests relate to circumstances surrounding an alleged breach of the lease agreement between the Steins and Creekside; however, breach of contract is not an issue

---

[3] The Court will construe this request as a request for the Court to deem the unanswered requests for admission as admitted pursuant to Fed. R. Civ. P. 36(a)(6).

**MEMORANDUM DECISION AND ORDER - 4**

presently before the Court. In the discovery requests remaining, the Steins draw legal conclusions and state matters of fact, many beyond the issues raised in this case, without laying proper foundation.[4]

Despite these legal deficiencies, the Court reviewed the discovery requests closely to determine whether the answers sought by the Steins may have included evidence relevant to their claims or Creekside's defenses in this action. Based on that review, however, the Court finds the requested information immaterial to its summary judgment analyses below. Accordingly, the Court will deny the Steins' motion to compel.

**2. Motion to Accept Unanswered Requests for Admission as Admissions (Dkt. 48)**

The Steins request that, if the Court finds no merit to Creekside's response to the motion to compel (Dkt. 42), the Court deem the Steins' unanswered requests for admission served upon Creekside as admitted and consider those admissions in the Court's analysis of the Steins' motion for summary judgment. As stated above, the Court finds the Steins' requests for admission legally deficient in both substance and form, and will deny the motion to deem them admitted as moot.

The Court acknowledged the timing of this motion (which was filed after the filing of the two summary judgment motions), and considered whether this motion was actually a request for discovery pursuant to Fed. R. Civ. P. 56(d). After review of the various discovery requests, and as explained above in the Court's motion to compel analysis,

---

[4] For example, one request for admission states as follows: "Do you admit or deny that the Creekside Seniors LP apartments do not have, and were not built with an Accessible Route into the Through the Covered Unit in compliance with the Federal Fair Housing Act Regulations, 24 CFR 100.205?" (Dkt. 42-3 at 12.)

**MEMORANDUM DECISION AND ORDER - 5**

several of the requests sought information unrelated to the issues in this litigation and none would have elicited facts or evidence essential for the Steins to justify their opposition to Creekside's motion for summary judgment.

## MOTIONS FOR SUMMARY JUDGMENT (DKTS. 43, 45)

In their amended complaint, the Steins allege several Fair Housing Act (FHA) and Rehabilitation Act (RA) violations, challenging Creekside's alleged failure to make reasonable accommodations on account of Mr. Stein's disability. The Steins further assert several retaliation claims under both the FHA and RA against Creekside. Last, the Steins allege the design of their dwelling is in violation of the FHA because it does not have a "secondary exit." Both parties filed summary judgment motions on all claims asserted against Creekside in the Amended Complaint.

## 1. Factual Background[5]

Creekside Seniors, L.P., owns Creekside Senior Apartments, a multifamily property located in Moscow, Idaho, funded through Section 42 Low Income Housing Tax Credits, as well as federal HOME Investment Partnership funds. *Dec. Hoagland*, ¶ 2. (Dkt. 45-4 at 2.) In September of 2011, James and Carol Stein moved to Creekside and have continued, through the present, to rent and occupy apartment #132. Mr. Stein suffers from coronary heart disease, chronic obstructive pulmonary disease, and diabetes;

---

[5] Unless otherwise indicated, the facts are undisputed. The Steins failed to properly address Creekside's statement of undisputed facts as required by Fed. R. Civ. P. 56(c). The Steins filed a "Statement of All Material Facts in Dispute" but allege generally, as to each of their claims, that "there are no known raised Disputed Material Facts from Defendants." (Dkt. 50.) Accordingly, the Court will consider Creekside's facts as undisputed for the purposes of consideration of the motions for summary judgment. *See* Idaho L. Rule 7.1(e).

**MEMORANDUM DECISION AND ORDER - 6**

Creekside does not dispute Mr. Stein is a disabled person for all purposes related to this matter.

The Steins' FHA and RA allegations arise out of various requests the Steins made to Creekside, which included requests to: (1) enforce the no-smoking policy as set forth in their lease; (2) memorialize their parking assignment in writing; (3) properly install reinforcements behind their shower grab bar in accordance with HUD regulations; and (4) install a secondary exit to their apartment. The Court will address the facts giving rise to each request separately below.

### A. Request to Enforce the No-Smoking Policy

Mr. Stein alleges his disability is exacerbated by exposure to second hand cigarette smoke, so he decided to move to Creekside due to its no-smoking policy. The lease agreement between Creekside and the Steins includes the following language regarding smoking on the Creekside Senior Apartment premises:

> **SMOKING:** It is understood that smoking is prohibited in the Apartment. In the event that smoking is conducted in the Apartment or breezeway, Tenant agrees such act constitutes a material and non curable breach of this lease resulting in immediate termination of [the] lease and grounds for immediate eviction.
>
> **…**
>
> No tenant, guests or other household members will be allowed to smoke in all common areas of the property. A common area is any corridor, breezeway, stairway or hallway, including the area immediately outside of apartments.

*Dec. Cooper,* Ex. 1—Stein Lease Agreement. (Dkt. 45-3 at 10, 15.) Despite the smoking prohibitions in the lease, prior to September of 2013, on-site Creekside management interpreted the "no smoking policy" to mean that smoking was prohibited in the

**MEMORANDUM DECISION AND ORDER - 7**

apartment and anywhere around the buildings, but that people could smoke on their porches and in outdoor common areas removed from the buildings.[6] *Id.* at ¶ 4 (Dkt. 45-3 at 2); *see also* (Dkt. 54-19 at 4.)

The Steins contend they began complaining of tenant smoking violations in 2012, when they noticed their next door neighbor smoking on his porch. *Am. Compl.* (Dkt. 30 at 11.) The Steins allege they made several requests to Creekside's former on-site manager, Michele Scher, to instruct the neighbor to stop smoking on his porch, but the requests were denied. *Id.*

The smoking tenant moved out, and was replaced by a new tenant in August of 2013. *Id.* Mr. Stein suspected the new tenant was also a "smoker" after noticing an ashtray on her porch. *Id.* Outraged that Creekside placed another smoking tenant next door, the Steins began contacting various legal representatives to assist them in their efforts to enforce Creekside's no-smoking policy.

First, the Steins retained attorney Jefferson Griffeath. On August 18, 2013, Griffeath sent Creekside a letter requesting the no smoking policy be properly enforced.[7] On September 5, 2013, counsel for Creekside, Theresa Kitay, responded to Griffeath's letter and informed him that Creekside strictly enforces its no-smoking policy, but would set up a designated smoking area away from the residential buildings to help Mr. Stein

---

[6] Once Mr. Stein began complaining of smoking violations, it was clarified by Creekside owners that "porch areas are either part of the 'apartment' leased by residents, or part of the 'breezeway' areas in which smoking is also prohibited by the lease." (Dkt. 54-19 at 4.) They clarified also that the "no-smoking" policy also included common areas of the property, not just the apartments and breezeways. *Dec. Cooper*, ¶ 7. (Dkt. 45-3 at 3.) Once these clarifications were made, counsel for Creekside ensured Mr. Stein that the prohibition would be enforced in the future. (Dkt. 54-19 at 4.)

[7] Mr. Griffeath's letter addressed also issues not raised in this matter, including violations of the Idaho Clean Air Act.

**MEMORANDUM DECISION AND ORDER - 8**

feel more comfortable about his neighbors who smoke. (Dkt. 54-19 at 6.) The same day, Mr. Stein visited the emergency room for "headache and hypertension brought on by his being upset and physically and mentally exacerbated over the illegal smoking at Creekside…" (Dkt. 54-7 at 5.) Mr. Stein alleges this was his third hospital visit after he moved into his Creekside apartment. *Id.*

The Steins next sought assistance from the Intermountain Fair Housing Council (IFHC) with a reasonable accommodation request to Creekside to enforce its no-smoking policy. On September 17, 2013, IFHC investigator Sammy Grayson sent a letter to Creekside explaining Mr. Stein's need for a reasonable accommodation to have the no-smoking policy enforced. *Dec. Cooper*, Ex. 2. (Dkt. 45-3 at 21.) On September 22, 2013, Kitay responded and informed Grayson that it was her position that he had not made a "reasonable accommodation" request under the FHA, because Mr. Stein was not requesting a change in the rules, policies, practices, or services." (Dkt. 54-19 at 6.) She explained that Creekside already had a no-smoking policy in place, and enforcement of an established rule or lease provisions is not a "change." *Id.*  In Kitay's letter, she encouraged the Steins to report any smoking violations to management so proper action could be taken promptly. *Id.*

The Steins then sought assistance from the University of Idaho Legal Aid Clinic. (Dkt. 54-8 at 2-3.) On September 17, 2013, legal intern Joseph Hayes sent a letter to Creekside demanding enforcement of the no-smoking policy in the lease. *Id.*

On about September 19, 2013, Creekside established a designated smoking area with signage adjacent to the Creekside community center—an area a considerable

distance from the Stein's apartment. *See Dec. Cooper,* Ex. 4—Map of Creekside. (Dkt. 45-3 at 26.)  The Steins, however, were upset with the location of the designated smoking area, as Mr. Stein alleged he could not access the community center amenities due to the presence of second hand smoke. *See Am. Compl.* (Dkt. 30 at 14.) The Steins and their legal intern worked together with Creekside to move the designated smoking area away from the community center. *HUD Final Investigative Report*, p. 17. (Dkt. 2-4 at 17.) On or about October 8, 2013, the designated smoking area was relocated to a grassy picnic location away from the community center and away from the Steins' apartment. *Dec. Hoagland*, ¶ 5. (Dkt. 45-4 at 12.) Though involved in the relocation decision, the Steins did not want a designated smoking area anywhere on the Creekside premises.  *Pl. Response to Summary Judgment*, § 1(A). (Dkt. 49 at 1.)

On October 8, 2013, Kitay responded to Hayes's demand letter to enforce the no-smoking policy. She explained that, after clarifying the policy with management, smoking on porches and anywhere adjacent to the residential buildings, including common areas, was prohibited and would be strictly enforced moving forward. On November 7, 2013, Creekside sent a "Reminder Notice" to all tenants reminding them that smoking is prohibited in apartments and in all common areas. *Dec. Cooper*, Ex. 3. (Dkt. 45-3 at 24.) The Steins allege they did not receive this notice. A second reminder was issued to all tenants on October 20, 2014. *Id.* at Ex. 10. (Dkt. 43-3 at 54.) Over the course of the Steins' continued efforts to enforce the no-smoking policy, they made

several complaints to management regarding smoking violations on Creekside premises.[8]

Creekside often followed up on the Steins' complaints and issued warnings to tenants

who allegedly were smoking outside the designated smoking area.[9]

Mr. Stein also personally investigated the alleged smoking violations by

photographing Creekside tenants he caught smoking. Mr. Stein alleges he took the

photographs under the direction of and instruction from the IFHC website. *See Am.*

*Compl.* (Dkt. 30 at 3). Several tenants complained to Creekside regarding the

photographs Mr. Stein was taking of them without their permission. On October 17,

2013, after having received at least three complaints from tenants regarding photographs

taken of them by Mr. Stein, Creekside issued a lease violation reminder to the Steins,

requesting that Mr. Stein stop taking photographs of the other tenants. *Dec. Cooper*, Ex.

9. (Dkt. 45-3 at 52.) Mr. Stein disregarded the notice and continued to take photographs

of the other tenants. On July 14, 2014, Creekside warned the Steins again to stop taking

photographs of the other tenants. *Am. Compl.*, Ex. 2. (Dkt. 2-5 at 19.) However, Mr. Stein

continued taking photographs.

On two occasions Mr. Stein's photographing activities resulted in the police being

called. First, on October 16, 2013, a tenant called the police to report Mr. Stein for taking

---

[8] 3/23/14, tenant #153, smoking on porch; 3/35/14 tenant #128 smoking in his car; 3/35/14 tenant #123 smoking in her car; 5/14/13-5/17/14, tenants #133 and #142 smoking together while Stein was out of town; 5/27/14 tenant #128 smoking on his porch; 6/22/14 tenant #128 smoking on his lawn; 6/26/14 tenant #128 smoking on his lawn; 6/28/14 tenants #128 and #102; 6/30/14 #102 smoking on lawn; 7/1/14 tenant #102 smoking outside; 7/11/14 tenant #102 smoking outside; 7/13/14 tenant #102 smoking outside. *See Complaint*, Ex. 2. (Dkt. 2-5 at 19.)
[9] 11/7/13, warning to tenant #133; 2/11/14, investigates tenant #127 for smoking in apartment; 4/8/14, warnings to tenant #153 and #142; 6/2014, evicts #142 for smoking in apartment; and 6/2/14, waring to tenant #102. *See Dec. Cooper*, Ex. 7. (Dkt. 45-3.)

**MEMORANDUM DECISION AND ORDER - 11**

photos of her without her permission. When the officer arrived, Mr. Stein alleges Creekside's manager, Scher, directed the officer to the Steins' apartment. *Am. Compl.* (Dkt. 30 at 3.) Second, on July 14, 2014, Mr. Stein called the police after he got into a verbal altercation with another tenant after he took a photograph of the tenant smoking on his lawn. The other tenant threatened to "beat [Mr. Stein's] ass." *Am. Compl.*, ¶ 11. (Dkt. 30 at 8.) The record does not indicate whether Mr. Stein, or anyone else, was charged with a crime in connection with either police incident.

### B. Request for Parking Space

Creekside alleges the Steins have, and always have had, an assigned carport located directly in front of the entry to their apartment. *Dec. Cooper*, ¶ 13. (Dkt. 45-3 at 60.) The Steins' assigned parking spot has a painted sign above it indicating "Tenant Parking Only." *Id.* at ¶ 1. (Dkt. 45-3 at 65.)

On May 2, 2014, Mr. Stein requested a "designated assigned accessible parking spot closest to my unit," as an accommodation for his disability. *Id.* at ¶ 12. (Dkt. 45-3 at 60.) The Steins allege this was not a request for an assigned parking space, but rather, a request for Creekside to memorialize in writing that the parking space (H-3) was theirs to use, similar to how their lease agreement identifies their specific apartment unit as #132. (Dkt. 49 at 5.) Mr. Stein alleges he worried Creekside might re-assign his parking spot to a farther location in retaliation for his various complaints regarding smoking violations. *Id.*

On May 6, 2014, Creekside discussed the parking request with the Steins. Creekside confirmed that the parking space directly in front of the Steins' unit was theirs,

MEMORANDUM DECISION AND ORDER - 12

and offered to install a sign to designate only they could park in their spot. The Steins told Creekside that a sign would be unnecessary. In September of 2014, Creekside sent a letter to the Steins to follow up on their parking space request. Creekside asked if any circumstances had changed regarding Creekside's previous offer to install a sign in front of his parking space. The Steins did not respond or send any other requests to Creekside regarding the parking space or signage of the space.

### C. Request for Proper Installation of Shower Grab Bar[10]

On May 2, 2014, Mr. Stein sent a letter to Creekside requesting a reasonable modification for a grab bar to be installed in his shower/tub. Within a week, Creekside installed the requested grab bar. On October 9, 2014, Mr. Stein sent a separate reasonable accommodation request, this time requesting that proper reinforcements be installed behind his shower grab bar consistent with the Housing and Urban Development (HUD) Guidelines. (Dkt. 30 at 10.) The Steins, however, do not allege in their amended complaint that either of them suffered any physical injury from the alleged improper reinforcements, or that the installed shower grab bar is unsafe for its intended use. *Id.*

On November 18, 2014, the Steins hired an engineering service, Rim Rock Consulting, Inc., to assess whether Creekside installed the proper reinforcements behind their shower walls, and also to ensure that the installed shower grab bar was properly

---

[10] A request for a grab bar is, technically, a request for a reasonable "modification" (i.e., a physical change to the premises) under the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(A), and would normally be the responsibility of the person making the request. Section 504, however, requires that reasonable modifications necessary for people with disabilities are in the nature of an "accommodation," and must be paid by the recipient of the federal financial assistance. Creekside, therefore, was obligated to install and pay for the requested grab bar because it is a recipient housing provider under Section 504.

reinforced to the wall consistent with applicable HUD codes and regulations. Rim Rock

Consulting's report provides in relevant part:

> The Fair Housing Act Regulations, 24 CFR 100.205, Part 2 Chapter 6 regulates your facility and installation. The code addresses your installation specifically and the code recognizes that; when installing a molded fiberglass fixture there is a gap between the fixture and the wall. The code requires additional blocking in order to fill the gap to ensure the "blocking fit snugly and fill the designated space." Based on the fact that the grab bar will flex a little when forced it is apparent that the "gap blocking" was not installed despite them feeling like [the grab bar] would support a significant force without failure. The ADA requires that grab bars withhold a 250 pound load. Further testing would be required to verify if that standard is met. Such testing would run the risk of failure and damage to the tub/shower fixture.
>
> ....
>
> My findings are that it is apparent that the "gap blocking" was not installed and thereby the installation does not fully comply with 24 CFR 100.205, Part 2 Chapter 6. Further, possibly destructive, investigations are required to determine if all the specifications were met.

*Rim Rock Consulting Report.* (Dkt. 54-5.)

Two days later, Creekside sent Jackie Sayer, Branch Office Supervisor for the

Idaho Housing and Finance Association, and Rusty Koller, the director of construction

who supervised the construction of Creekside Senior Apartments, to investigate the

Steins' concerns regarding the installation of their shower grab bar. Sayer found that the

grab bar was stable, solid, and served the purpose for which it is intended. During her

inspection, Mr. Stein allegedly told Sayer and Koller that his concern was not that the

grab bar was unsafe, but that, in his opinion, the grab bar was not installed precisely in

the way referenced in the FHA Design Manual. Koller further contends that treated

plywood was installed on the back of every shower unit during construction, including the Steins' unit, to allow for the later installation of a grab bar when needed.

During the inspection, both Sayer and Koller observed Mr. Stein standing in the shower, grabbing the grab bar, and pulling and pushing it with force; fortunately, no damage occurred, and the grab bar remained in place despite Mr. Stein's efforts to tear it off the wall.

### D. Request for a Second Exit

The Steins allege they verbally complained to Creekside regarding the lack of a second exit to their apartment, which the Steins believe is a design requirement of the FHA. Mr. Stein alleges apartment manager Scher denied his request and told him "no, you can crawl out the window." *Am. Compl.* (Dkt. 30 at 5.)

## II. Procedural Posture

In March of 2014, the Steins filed a complaint with the United States Department of Housing and Urban Development (HUD) pursuant to the Fair Housing Act, 42 U.S.C. § 3610(a). The Steins' complaint alleged that Creekside failed to provide them with a reasonable accommodation by not enforcing the property's no-smoking policy. After conducting an investigation of the allegations made in the Steins' complaint, HUD dismissed the complaint on August 4, 2014, finding that "no reasonable cause exists to believe that a discriminatory housing practice has occurred."[11] *HUD Determination of No Reasonable Cause Report.* (Dkt. 2-3.) Specifically, the report provided in relevant part:

---

[11] The Steins submitted the HUD Determination of No Reasonable Cause Report and the HUD's factual findings. (Dkts. 2-3; 2-4; 2-5.) The Court does not rely on HUD's conclusion of no reasonable cause, but

**MEMORANDUM DECISION AND ORDER - 15**

[T]here is insufficient evidence to conclude that Complainant's request to have an absolute smoking ban on the entire premises is reasonably needed insofar as it is necessary to allow Complainant the full enjoyment of his dwelling, even if it goes against the contractual obligations of Respondents as stipulated in the lease. The Department does not have authority to enforce non-compliance of lease provisions as these issues are beyond the scope of its jurisdiction. Complainant's request to enforce no-smoking violations in or around other tenants' units that are located well beyond the reasonable distance from his own unit, including those where he witnessed while driving his car, are not reasonably related to the use and enjoyment of his own dwelling unit.

[T]he investigation revealed that Respondents did not deny or unreasonably delay Complainants reasonable requests to enforce the no-smoking provision of the lease. Respondents provided sufficient evidence in the record to conclude that there appeared to be a continuous interactive process in responding to Complainant's accommodation requests. Furthermore, the record established that Respondents' efforts to accommodate Complainant went beyond Complainant's dwelling area, as they enforced his complaints on other tenants, provided at least two additional notices to all of the tenants at the Property. Finally, the record shows that Respondents worked with Complainant and his legal intern to move the designated smoking area to another part of the property so that Complainant can access the office, laundry, and mailboxes without having to be subjected to the secondhand smoke. Therefore, there is insufficient evidence to conclude that Complainant was denied a reasonable accommodation under the Act.

*Id.* (Dkt. 2-3 at 9.) The Steins submitted a request for reconsideration. But, before HUD could consider the Steins' reconsideration request, they filed this action on October 8, 2014.[12]

## III. Summary Judgment Standard

---

includes the HUD decision to provide a thorough understanding of the procedural background of this action.

[12] According to documents submitted by the Steins, HUD denied the request for reconsideration on July 13, 2015. (Dkt. 54-2 at 10.)

**MEMORANDUM DECISION AND ORDER - 16**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). There must be a genuine dispute as to any material fact—a fact "that may affect the outcome of the case." *Id*. at 248. The Court must be "guided by the substantive evidentiary standards that apply to the case." *Id*. at 255.

The moving party is entitled to summary judgment if that party shows that each issue of material fact is not or cannot be disputed. To show the material facts are not in dispute, a party may cite to particular materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B); *Ransier v. United States*, 2014 WL 5305852, at *2 (D. Idaho Oct. 15, 2014).

Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." The existence of a scintilla of

**MEMORANDUM DECISION AND ORDER - 17**

evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment—where both parties essentially assert that there are no material factual disputes—does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

### 3. Steins' Motion for Summary Judgment (Dkt. 43)

On August 3, 2015, the Steins filed a one page motion for summary judgment, requesting the Court "[e]xamine the record and determine whether any material questions exist for the Judge to decide, as called for under Rule 56." (Dkt. 43.) On August 17, 2015, the Steins filed an Affidavit in Support of their Motion for Summary Judgment. (Dkt. 46.) The "affidavit" [13] merely reiterates the allegations made in the complaint. And, while it makes reference to certain documents which may support the Steins' claims, these documents were not attached to this filing. [14]

The Steins' motion was not properly supported. It is not the duty of the Court to search the record on its own to determine whether genuine issues of material fact exist, or

---

[13] This document is improperly labeled as an "affidavit" as it is not notarized. *See* 2A C.J.S. Affidavits § 35. However, the document does qualify as a declaration as it is signed under penalty of perjury, and thus, will be considered as such. *See* Fed. R. Civ. P. 56 (c)(1)(A).

[14] Some of the referenced documents were later attached to the Steins' response in opposition of Creekside's motion for summary judgment and are considered by the Court. (Dkt. 49.)

**MEMORANDUM DECISION AND ORDER - 18**

do not exist, in support of a party's motion for summary judgment. Instead, the moving party bears the burden of supporting his assertions by citing to the record, or by showing how the material cited in the record does not establish the absence, or presence, of a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c).

The Steins did not provide the Court with any legal argument to support how they have proved their claims against Creekside, or alternatively, how Creekside has failed to satisfy its burden on any of its affirmative defenses. Accordingly, the Court will deny the Steins' motion for summary judgment but will consider materials submitted by the Steins, if and as appropriate, when addressing Creekside's cross motion.

## 4. Creekside's Motion for Summary Judgment (Dkt. 45)

### A. Failure to Accommodate Claims

The Steins' allege three FHA and RA violations against Creekside for failure to accommodate Mr. Stein's disability. These violations include Creekside's failure to: (1) enforce the no-smoking policy in the lease agreement; (2) memorialize the Steins' parking space in a written agreement; and (3) install the proper reinforcements behind their shower wall to support the shower grab bar, pursuant to HUD regulations. For the reasons explained more fully below, the Court finds no genuine issues of material fact remain upon which a reasonable jury could conclude Creekside failed to accommodate Mr. Stein's disability on any of the Steins' three claims.

#### i. Reasonable Accommodation Standard

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or

**MEMORANDUM DECISION AND ORDER - 19**

facilities in connection with such dwelling, because of a handicap." 42 U.S.C. §

3604(f)(2). Under 42 U.S.C. § 3604(f)(3)(B), discrimination includes "a refusal to make

reasonable accommodations in rules, policies, practices, or services, when such

accommodations may be necessary to afford such person equal opportunity to use and

enjoy a dwelling." Likewise, Section 504 of the RA guarantees that a "covered entity,

such as a [public housing authority], must provide reasonable accommodations in order

to make the entity's benefits and programs accessible to people with disabilities."

*Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 337 (E.D.N.Y. 2012)

(internal quotations omitted). Accordingly, the analyses of reasonable accommodation

under the FHA and RA are conducted similarly.[15]

To prevail on a failure to accommodate claim under the FHA, a plaintiff must

prove the following elements: (1) the plaintiff is a disabled person within the meaning of

the FHA; (2) the defendant knew or had reason to know of plaintiff's disability; (3) a

reasonable accommodation of the disability "may be necessary" to afford the disabled

person an equal opportunity to use and enjoy the dwelling; and (4) defendant refused to

make the necessary accommodation. *Giebeler v. M & B Associates,* 343 F.3d 1143, 1147

(9th Cir. 2003).

---

[15] "The House Committee Report on the [FHA] does state, however, that the interpretations of 'reasonable accommodation' in the Rehabilitation Act ("RA") regulations and case law should be applied to the [FHA's] reasonable accommodation provision." *Giebeler v. M & B Associates*, 343 F.3d 1143, 1147 (9th Cir. 2003)(applying RA regulations and case law in its interpretation of the FHA's reasonable accommodation provisions).

**MEMORANDUM DECISION AND ORDER - 20**

Here, Creekside does not dispute that Mr. Stein is disabled for the purposes of the FHA, nor does it dispute that it knew of Mr. Stein's disability. Rather, Creekside challenges the last two prongs of the burden of proof the Steins' must meet to proceed on their failure to accommodate claims. The plaintiff bears the initial burden of proving the elements of his FHA claim as to both reasonableness and necessity. *Morgan v. Fairway Nine II Condo. Ass'n Inc.*, 2015 WL 1321505, at *5-6 (D. Idaho Mar. 24, 2015).

"The reasonable accommodation inquiry is highly fact-specific, requiring case-by-case determination." *DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua,* 453 F.3d 1175, 1179 (9th Cir. 2006) (quoting *Cal. Mobile Home Park,* 107 F.3d at 1380). An accommodation is reasonable under the FHA if it does not impose "undue financial and administrative burdens" or constitute a "fundamental alteration in the nature of [defendants' practice]." *Giebler,* 343 F.3d at 1157 (citation omitted). "[The plaintiff] must show the existence of a reasonable accommodation; i.e., that a reasonable accommodation was possible." *Morgan*, 2015 WL 1321505, at *5-6. "Once that initial showing is made, the Defendants must show that the accommodation is unreasonable." *Id.*

As to the "necessary" element, the accommodation sought must be "necessary to afford [the claimant] full enjoyment of the premises"... or "equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3) (A & B). "An accommodation is necessary if there is evidence 'showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability.'" *Morgan*,

**MEMORANDUM DECISION AND ORDER - 21**

2015 WL 1321505, at *5-6 (citing *Dadian v. Vill. of Wilmette,* 269 F.3d 831, 838 (7th Cir. 2001) (internal citation and quotation marks omitted)).

Not every practice that creates a general inconvenience or expense to a disabled person must be accommodated. *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006). Rather, to "prove that an accommodation is necessary, '[p]laintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice.'" *Giebler v. M & B Assocs.,* 343 F.3d 1143, 1155 (9th Cir. 2003) (quoting *Smith & Lee Assocs. v. City of Taylor,* 102 F.3d 781, 795 (6th Cir. 1996)). In other words, "[w]ithout a causal link between defendants' [practice] and the plaintiff's injury, there can be no obligation on the part of defendants to make a reasonable accommodation." *Id.* (quoting *United States v. California Mobile Home Park Mgmt. Co.,* 107 F.3d 1374, 1380 (9th Cir. 1997)).

### ii. Request to Enforce Creekside's No-Smoking Policy

The Steins allege Creekside failed to accommodate Mr. Stein's disability by not enforcing the no-smoking policy as set forth in the lease agreement. Mr. Stein alleges his disability is exacerbated by exposure to second hand cigarette smoke. Though the lease's no-smoking provision prohibits smoking in apartments and "breezeways," the Steins interpret the no-smoking policy as a smoking ban on the entirety of the Creekside premises, and contends enforcement of the no-smoking policy on the entire property, including the "designated smoking area," is necessary for Mr. Stein to enjoy an equal opportunity of the use of his apartment and other common amenities on the Creekside property.

**MEMORANDUM DECISION AND ORDER - 22**

Creekside challenges the Steins' failure to accommodate claim regarding the no-smoking policy on two grounds. First, Creekside contends it did not fail to accommodate Mr. Stein with regard to his smoking concern, but rather, Creekside took all appropriate and reasonable steps to enforce its no-smoking policy to accommodate him. Second, Creekside argues Mr. Stein's request for a complete smoking ban on the premises is unnecessary for him to have an equal opportunity to use and enjoy his apartment.

With regard to reasonableness, assuming *arguendo* that Mr. Stein's general request for Creekside to enforce its no-smoking policy was reasonable, Mr. Stein is not entitled to the accommodation of his choosing—a smoking ban on the entire Creekside Apartment premises. Here, in an effort to accommodate Mr. Stein, Creekside established a designated smoking area so that Mr. Stein could feel more comfortable about his neighbors who smoke by avoiding the single designated smoking area on the premises. Creekside even went so far as to re-locate the designated smoking area to a location not utilized by Mr. Stein and that is far from the Steins' apartment and Creekside community center. This is an alternative accommodation and modification of Creekside's policies which would effectively meet Mr. Stein's disability needs to limit his exposure to second hand smoke.

Further, the Steins fail to allege facts or set forth evidence to support a position that, but for an entire smoking ban on Creekside premises, Mr. Stein is denied the equal opportunity to use and enjoy his dwelling and common areas. The Steins have offered evidence of other tenants smoking on the property, but fail to argue how Creekside's non-

**MEMORANDUM DECISION AND ORDER - 23**

enforcement of these alleged smoking violations interfered with Mr. Stein's use and enjoyment of his apartment or Creekside amenities.[16]

The Court concludes Creekside has succeeded, based on the record before the Court, in establishing the absence of a genuine issue of material fact with regard to the reasonableness and necessary elements of the Steins' failure to accommodate claim. Accordingly, the Court needs not reach Creekside's argument challenging the fourth element of the Steins' claim—Creekside's alleged failure to make the specific accommodation requested. Summary judgment will be granted in favor of Creekside regarding this failure to accommodate claim.

### iii. Request for Parking Space in Writing

The Steins allege that Creekside failed to accommodate Mr. Stein's disability by not assigning him a written designated parking space nearest to his apartment unit. In his reply, Mr. Stein clarifies his request was not a request for an assigned parking space, but rather, a request to Creekside to memorialize in writing that his parking space (H-3) was designated for his exclusive use, similar to how his lease agreement identifies his specific apartment unit. *Response*. (Dkt. 49 at 5.)

The Steins allege Mr. Stein worried Creekside might re-assign his parking space to another location in retaliation for his various smoking violation complaints. *Id.* He contends also that it was Creekside's practice to use parking spaces as "leverage" or to

---

[16] The Steins allege in their affidavit in support of summary judgment that the new designated smoking area is "occasionally used for family recreational sports such as [badminton], golf practice and a grandchildren's play area;" however, the Steins do not allege that they personally used or intended to use the area for those, or any activities. *See* (Dkt. 46 at 5.)

reward tenants for overlooking lease violations. Creekside challenges the Steins' claim on the ground that the accommodation request for a written parking space agreement was not motivated by any disability related need; thus, his request is not one for a reasonable accommodation or otherwise.

Mr. Stein's own admission in his response that his request for a written parking space agreement was not motivated by any disability-related need demonstrates his request was unreasonable under the FHA. The Steins offer no evidence to support any retaliation allegation with regard to Creekside's failure to provide a written agreement for the parking space. The Court notes also that, in addition to failing to demonstrate reasonableness of his request for a written parking space agreement, the Steins also failed to demonstrate the necessity of this requested accommodation. *See Giebler v. M & B Assocs.,* 343 F.3d 1143, 1155 (9th Cir. 2003) ("Without a causal link between defendants' [practice] and the plaintiff's injury, there can be no obligation on the part of defendants to make a reasonable accommodation"). Nonetheless, Creekside attempted to accommodate Mr. Stein by offering to install a sign above the assigned parking space to let other tenants know the spot was for the Steins' exclusive use. The Steins declined the offer.

Accordingly, the Court concludes Creekside has succeeded, based on the record before the Court, in establishing the absence of a genuine issue of material fact with regard to the reasonableness and necessary elements of this failure to accommodate claim.

### iv. Request for Shower Grab Bar

The Steins contend Creekside failed to accommodate Mr. Stein's disability related request to have the proper backing installed in his shower/tub wall as required by the FHA and HUD Guidelines. [17] Creekside contends reinforcements were installed during the initial construction of the apartment complex. And further, Creekside argues the HUD's Guidelines regarding the installation of reinforcements are not mandatory, and a deviation from the Guidelines does not result in a discrimination violation under the FHA when an alternative installation method used to install grab bar reinforcements renders the grab bar safe for its intended use—which Creekside contends is the case here.

The FHA defines discrimination as the failure to design and construct covered multifamily dwellings, designed for first occupancy after March 13, 1991, in such a manner that:

> [A]ll premises within the dwellings contain the following features of adaptive design:
>
> ....
>
> [R]einforcements in bathroom walls to allow later installation of grab bars

42 U.S.C. § 3604(f)(3)(C).

"Congress authorized the Secretary of HUD to promulgate regulations to implement the FHA and provide technical assistance to help achieve the Act's accessibility requirements." *Memphis Ctr. for Indep. Living v. Richard & Milton Grant Co.*, 2004 WL 6340158, at *3 (W.D. Tenn. June 29, 2004); § 3601, 3604(f)(5)(C).

---

[17] Section 504 has no specific design and construction standards for grab bars. HUD's regulations merely require that covered housing be designed and constructed so that it is "readily accessible to and usable by individuals with" disabilities. 24 C.F.R. §8.22(a).

Pursuant to this authority, HUD issued Guidelines to implement the FHA's design and construction requirements. *See* 56 Fed.Reg. 9473–9515 (Mar. 6, 1991).

"The purpose of the Guidelines is to describe minimum standards of compliance with the specific accessibility requirements of the Act." 56 Fed.Reg. at 9476. However, the Guidelines are not mandatory, and failure "to meet the requirements as interpreted in the Guidelines does not constitute unlawful discrimination" pursuant to the FHA.[18] *Memphis*, 2004 WL 6340158, at *3; 56 Fed.Reg. at 9476. This leaves builders the option to depart from the Guidelines and seek alternate ways to demonstrate compliance with the FHA's accessibility requirements. 56 Fed.Reg. at 9473. However, if a construction feature is not compliant with the HUD Guidelines, then a housing provider defending an FHA violation must demonstrate that the construction feature is nonetheless "reasonably accessible and usable for most physically disabled people." *Memphis*, 2004 WL 6340158, at *3.

The Court finds a genuine issue of fact exists as to whether the Steins' shower wall reinforcements are compliant with the HUD Guidelines; however, issue of fact is not material. The Rim Rock report submitted by the Steins opines that the proper "gap blocking" was not installed to the back of Steins' fiberglass shower/tub wall pursuant to the HUD Guidelines. The report does not allege that no reinforcements were installed, only that the proper reinforcements, as recommended by the HUD Guidelines, were not

---

[18] The Guidelines provide that compliance may be achieved by meeting a 'comparable standard'—i.e., one that provides 'access essentially equivalent to or greater than required by ANSI A117.1.'" *Memphis*, 2004 WL 6340158, at *4; 54 Fed.Reg. 3243.

**MEMORANDUM DECISION AND ORDER - 27**

installed. Koller, on the other hand, asserts that plywood reinforcements were installed during the initial construction to support installation of the grab bar as requested by the Steins.

The Court need not determine whether the existing reinforcements are compliant with the HUD regulations. Even assuming the reinforcements in Steins' shower /tub wall are not compliant with the HUD Guidelines, no genuine issue of material fact exists to rebut Creekside's argument that the shower grab bar is "reasonably accessible and usable for most physically disabled people." *Memphis*, 2004 WL 6340158, at *3.

Sayre, the Idaho Branch Officer Supervisor for the Idaho Housing and Finance Association, inspected the Steins' shower grab bar and found the grab bar to be "completely stable, solid, and serves the purpose it is intended for." *Dec. Sayre*, Ex. 1. (Dkt. 45-5 at 6.) The Steins do not allege or offer evidence to refute that the reinforcements, which may or may not be complaint with the HUD Guidelines, made the shower grab bar unsafe for its intended use.[19] In fact, during Sayer's and Koller's investigation of the Steins' shower grab bar, they witnessed Mr. Stein pulling and pushing on the grab bar with force, and the grab bar still remained affixed to the shower wall. Accordingly, the Court finds no genuine issues of material fact exist upon which a reasonable jury could conclude that the Steins' shower grab bar is not safe for its intended use.

---

[19] The Steins' response in opposition to Creekside's motion for summary judgment makes two new arguments as to why the shower grab bar is not compliant; they allege: (1) only one grab bar was installed, when two should have been installed; and (2) placement of the grab bar is too high. The Steins may not allege additional failure to accommodate claims for requests not made to Creekside previously at this stage in the litigation.

Further, the Court finds the Steins' request for the installation of HUD compliant reinforcements fails also because the request is unreasonable under the FHA. The Rim Rock report indicates that, to determine whether proper reinforcements were installed behind Steins' shower/tub wall, it likely would require destruction of the shower itself. To destroy the Steins' shower to confirm compliance or non-compliance of the HUD Guidelines would constitute an undue financial burden on Creekside, especially when considering the shower grab bar is safe for its intended use. *See Giebeler v. M & B Associates,* 343 F.3d 1143, 1147 (9th Cir. 2003) (An accommodation is reasonable under the FHA if it does not impose "undue financial and administrative burdens" or constitute a "fundamental alteration in the nature of [defendants' practice]."). For all of these reasons, summary judgment will be granted in favor of Creekside on this failure to accommodate claim.

### B. Retaliation Claims

The Steins allege Creekside retaliated against Mr. Stein on three occasions in violation of the FHA and RA. Specifically, they allege Creekside retaliated against Mr. Stein by: (1) establishing a designated smoking area on Creekside premises; (2) calling the police for taking photographs of neighbors; and (3) providing the Steins a notice to cease taking photographs of other Creekside residents. For the reasons that follow, the Court finds there is no genuine issue of fact upon which a reasonable jury could conclude that Creekside retaliated against Mr. Stein.

### i. Standard of Law

**MEMORANDUM DECISION AND ORDER - 29**

It is unlawful under the FHA to "coerce, intimidate, threaten, or interfere with any person... on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section... 3604...." 42 U.S.C. § 3617.

To establish a *prima facie* case of retaliation case under the FHA, "the plaintiff must prove that '(1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action.'" *Idaho Aids Found., Inc. v. Idaho Hous. & Fin. Ass'n*, 422 F. Supp. 2d 1193, 1204 (D. Idaho 2006) (citing *Walker v. City of Lakewood,* 272 F.3d 1114, 1128 (9th Cir.2001)).  A *prima facie* case of retaliation under the RA requires the same showing; accordingly, the analysis of retaliation under the FHA and RA are treated the same. *See Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) (elements of retaliation pursuant to RA).

If successful, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision." *Walker, 272 F.3d at 1128; see also Sedivy v. City of Boise*, 2006 WL 1793607, at *5 (D. Idaho June 28, 2006) "If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.*

### ii. Establishment and Relocation of Designated Smoking Area

The Steins allege two retaliation claims with respect to the designated smoking area. First, they allege Creekside retaliated against Mr. Stein by establishing a designated smoking area on Creekside premises because of the various requests he made to enforce the no-smoking policy in the lease. Second, the Steins allege Creekside retaliated against

**MEMORANDUM DECISION AND ORDER - 30**

Mr. Stein by "reinstating" the designated smoking area to another location after they requested the no-smoking policy be enforced. The alleged "protected activities" and "adverse actions" for each claim are the same. The Steins contend Mr. Stein participated in the protected activity of making verbal requests to enforce Creekside's no-smoking policy. *Am. Compl*, ¶¶ 4, 6. (Dkt. 30 at 3-5.)  And, he contends "the adverse action" was the original establishment of a designated smoking area near the community center and the later reestablishment of the area's second location. *Id.*

Creekside does not deny that Mr. Stein's concerns about the property's no-smoking policy motivated the establishment and relocation of the designated smoking area from its original location. Rather, Creekside contends both actions were done in an attempt to assist and accommodate Mr. Stein's disability, not to retaliate against him for making his complaints in the first instance.

Following complaints from Mr. Stein to enforce Creekside's no-smoking policy, particularly against his next door neighbor, Creekside established a designated smoking area near the community center in an effort to "help Stein feel more comfortable about those neighbors who choose to smoke outside their apartment homes." (Dkt. 54-19 at 6.) Mr. Stein complained about the location of the designated smoking area on account of its close proximity to the community center, which contains several amenities Mr. Stein contends he utilizes.

In consideration of Mr. Stein's complaint about the designated smoking area's location, Creekside moved the smoking area away from the community center amenities. Prior to choosing the new location, Creekside consulted with on-site staff to confirm that

the new location would be accessible to all, and would not pose a hardship on those residents who wished to avoid secondhand smoke. Further, the record indicates that Creekside sought input also from Mr. Stein on the relocation of the smoking area, and that Stein approved the location. [20]

Based on the above facts, the Court concludes Creekside's establishment and later relocation of the designated smoking area was done in an effort to accommodate Mr. Stein's disability and finds further, there is no genuine issue of material fact upon which a reasonable jury could conclude that Creekside's establishment and relocation of the designated smoking area constituted retaliation for Mr. Stein's requests to enforce the no-smoking policy. Accordingly, the Court will grant summary judgment in favor of Creekside with respect to these retaliation claims.

### iii. Calling the Police

The Steins allege Creekside retailed against Mr. Stein by reporting him to the police for taking photographs of other Creekside tenants he caught smoking on the premises. The Steins allege Mr. Stein was engaged in the protected activity of photographing other residents and the "adverse action" committed by Creekside was that Creekside's former on-site manager, Scher, contacted the local police authorities and "direct[ed them] to my apartment and refer[ed] to me as a criminal stalker, upon

---

[20] The HUD Report contains a summary of an interview with Mr. Stein's legal intern. Creekside's attorney, Kitay, sent Mr. Stein's legal intern a map with the proposed location to relocate the designated smoking area. The legal intern reported he reviewed the proposed location with Stein, and "because there did not appear to be anywhere else that the smoking area could have been placed where it wouldn't affect others[], he told Ms. Kitay that the proposed place would work." *HUD Final Investigative Report*. (Dkt. 2-4 at 17.) The Steins do not contest this fact.

receiving a complaint from the tenant in apt. #102… who I had photographed smoking on her porch in public view." *Am. Compl.*, ¶ 3. (Dkt. 30) Creekside denies that any of its agents reported the Steins to the police for any reason.

The HUD findings contain an interview from Moscow Police Officer, Mitch Running, who responded to the incident at issue. According to the report (which was submitted by the Steins as an exhibit to both their complaint and their opposition to summary judgment), a tenant at the property called the police—not Creekside or any of its agents. (Dkt. 54-8.) The Steins have not produced evidence to rebut this fact.

Accordingly, the Court concludes Creekside has succeeded, based on the record before the Court, in establishing the absence of a genuine issue of material fact with regard to the adverse action element of this retaliation claim asserted by the Steins.

### iii. Demand letters re: photographing tenants

The Steins allege Creekside's notice sent to them requesting that Mr. Stein stop photographing other residents without their consent constitutes unlawful retaliation under the FHA. The Steins allege Mr. Stein's protected activity was taking photographs of his neighbors, and that the adverse action was the notice sent to him by Creekside to stop taking the photographs. Creekside argues taking photographs is not a protected activity, and also that the issuance of a lease violation reminder does not constitute coercion, threats, or interference, and thus, is not an adverse action.

The particular notice sent to Steins provides the following:

Dear Tenants:

Management is in receipt of formal written complaints stating you have been going around the other side of the apartment complex taking pictures of some of the tenants without their consent. It's also been brought to our attention that your next door neighbor has numerously asked you to please stop spying on her.

Please allow us to amicably remind you that we have evacuated [sic] your complaints and concerns about smoking policies at Creekside Seniors. Michelle has walked with you a couple of times to your next door neighbor just to find there is no evidence of her smoking in her unit. She has explained and shown to you that there is no vent connection between her apartment and yours and that the ashtray you once mentioned as evidence of her smoking was still seal[ed] tight.

We want to thank you and let you know we appreciate your tenancy but that we ask you join us in our efforts to keep Creekside Seniors a clean and safe place of residence where a good neighbor atmosphere is prevalent.

Thank you,
Creekside Seniors

*Dec. Cooper*, Ex. 9. (Dkt. 45-3 at 52.)

The Court finds no reasonable jury could conclude that the issuance of this notice qualifies as coercion, intimidation, a threat, or interference by Creekside regarding Mr. Stein's photography, regardless of whether his photographing other tenants could be construed as a protected activity.[21] Accordingly, the Court will grant summary judgment in favor of Creekside with respect to this retaliation claim.

The Steins allege also that their reporting of "102+ incidences of illegal smoking" created an "atmosphere of resentment from the 8 to 10 tenant smokers against" them. Creekside's tenants' resentment of Mr. Stein for taking their photographs without

---

[21] Creekside issued this notice only after it received three tenant complaints regarding Mr. Stein's photographs. Mr. Stein continued to take numerous photographs after this notice was issued. Accordingly, the notice cannot be considered an adverse action for the protected activity of taking photographs.

**MEMORANDUM DECISION AND ORDER - 34**

permission is not an adverse action on the part of Creekside, the only named defendant in this action. Accordingly, the Court will grant summary judgment in favor of Creekside with respect to this retaliation claim as well.

### C. Lack of Secondary Exits

The Steins allege they made a reasonable request for accommodation for a second exit to be constructed for their apartment to meet a FHA compliance requirement. *Am. Compl.* (Dkt. 30). Stein's interpretation of the FHA is misplaced. The FHA provides in relevant part:

> In connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after September 13, 1988, a failure to design and construct those dwellings in such a manner that:
>
> > [A]ll premises within such dwellings contain the following features of adaptive design:
> >
> > [A]n accessible route into and through the dwelling

42 U.S.C.A. § 3604. This requirement is to ensure "doors into and within covered units are sufficiently wide to allow passage by people in wheelchairs." *Nat'l Fair Hous. All., Inc. v. Hunt Investments, LLC*, 2015 WL 4362864, at *1 (E.D. Va. July 14, 2015); *see also United States v. Pac. Nothwest Elec., Inc.*, 2003 WL 24573548, at *14 (D. Idaho Mar. 21, 2003). Nowhere in the FHA does it require a covered unit to have a second exit. Accordingly, the Steins' claim fails as a matter of law and summary judgment will be granted in favor of Creekside on this claim for relief.

### <u>ORDER</u>

**MEMORANDUM DECISION AND ORDER - 35**

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)  Plaintiffs' Motion to Compel (Dkt. 40) is **DENIED**;

2)  Plaintiffs' motion to consider unanswered admissions as admitted (Dkt. 48)

    is **DENIED** as **MOOT**;

3)  Plaintiffs' Motion for Summary Judgment (Dkt. 43) is **DENIED**; and

4)  Defendant's Motion for Summary Judgment (Dkt. 45) is **GRANTED**.

Dated: **March 04, 2016**

Honorable Candy W. Dale
United States Magistrate Judge